CSE CONSTRUCTION CO., INC., Plaintiff,

v.

UNITED STATES, Defendant.

No. 03–789C.

United States Court of Federal Claims.

Aug. 26, 2003 [1].

1. This opinion was issued under seal on August 26, 2003. The parties were instructed to identify protected material subject to redaction. In response, the parties have stipulated that the opinion does not contain protected material. The original opinion is, therefore, reissued unsealed.

Lorenzo F. Exposito, Powell, Goldstein, Frazer & Murphy, LLP, Washington, D.C., for the plaintiff.

Thomas L. Koger, Commercial Litigation Branch; David M. Cohen, Director, Commercial Litigation Branch, Civil Division; Robert D. McCallum, Jr., Assistant Attorney General, United States Department of Justice, for the defendant. Dawn Phillips Wade, Office of General Counsel, United States Department of the Army, Kansas City District, Corps of Engineers, Kansas City, Missouri; Beverley Hazelwood Lewis, Office of Counsel, Small Business Administration, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

The plaintiff, CSE Construction Company, Inc. (CSE), filed a post-award bid protest seeking to set aside the award of a construction contract by the United States Army Corps of Engineers (Corps) to KCI Construction Co. (KCI) for the renovation of two firing ranges at Fort Leonard Wood, Missouri. The plaintiff requests judgment from this court declaring that the plaintiff is "eligible for the Fort Wood Contract award," and

an injunction permanently "enjoining ... the Corps of Engineers from allowing continued performance of the Fort Wood Contract by any offeror or contractor other than CSE." The defendant has filed a cross-motion for judgment on the administrative record.

## FINDINGS OF FACT

On July 20, 2001, the United States Army requested funds from Congress for the purpose of upgrading two firing ranges at Fort Leonard Wood, Missouri. According to the Army's funding request, renovation of the firing ranges was necessary in order to "reconfigure existing ranges for the integration of the Next Generation Targetry System."[2] The Army emphasized in its funding request that it considered upgrading the firing ranges to be "Fort Leonard Wood's most critical training facility requirement," and described the existing firing range facilities as "decrepit," "dilapidated," "substandard," and "inadequate." The Army also stated that Fort Leonard Wood's existing firing range facilities were insufficient to train soldiers according to current standards:

The standard method of conducting night and Nuclear, Biological and Chemical-environment (NBC) record fire is to use a record fire range with a 25m firing line. However, with a training load of over 40,-000 soldiers a year ... Fort Leonard Wood's two record fire ranges are already insufficient to handle the training load for actual Record Firing. Consequently, soldiers conducting night and NBC firing return to a range that [sic] upon which they have already been trained in Day/Night Defense Firing. This familiarity detracts from realistic training conditions, and Training Support Package (TSP) standards are not met. (Consequently, soldiers do not receive an evaluation score).

The Army's funding request contemplated physical improvements to the existing firing range facilities, including an "observation tower, covered mess facility for 240 soldiers, and 300 chair classroom. Supporting facilities include utilities, bleachers, security fencing, parking, target cable installation, well house, maintenance road, and site improvements." The total amount the Army requested for the firing range renovations was $4,322,000.00.

The Corps issued Solicitation Number DACA41–02–R–0006 for the "Construction of Upgrade Night Fire Range and Automatic Fire Range" at Fort Leonard Wood, Missouri. The solicitation, a Request For Proposals (RFP), described the Fort Leonard Wood contract as entailing the following design and construction work:

The design/build contractor will be responsible for the design and construction of new support facilities at this range. These facilities include a multi-story control tower, a 251 square meter classroom/storage/latrine building, a 100–person covered mess facility, a 300–person bleacher enclosure, an ammunition breakdown building, water service (consisting of a new water main connecting to the existing Base water system), sanitary service (consisting of a combination of a gravity sewer and a lift station and force main connecting to the existing Base sewer system), access and maintenance roads, all necessary earthwork, seeding, and erosion control measures, electrical service, telephone service, night lighting, HVAC systems, anti-terrorism/force protection measures, and other ancillary improvements. The design/build contractor will also modify the existing walk-in foxholes to add wing walls at the foxhole entrances. Building furniture, control tower equipment, and bleachers will be provided by others.

The solicitation contemplated the award of a firm fixed price contract to the responsible offeror whose proposal represented the best value to the government as determined by

---

2. The Next Generation Targetry System was expected to provide a number of benefits over the targetry system then in place at Fort Leonard Wood:

This system will improve the capability to train and evaluate soldiers' ability to correctly detect and engage targets and adjust for the effects of wind and gravity. The new equipment, installed on a properly configured range, will provide[ ] realistic, time-constrained training environment. The new system provides computer-controlled target manipulation, and automated scoring for both day and night combat training.

the Corps' evaluation of the price and technical factors set out in the solicitation. The solicitation provided that bids would be evaluated on the basis of three technical factors and price, and stated that proposals should demonstrate the offeror's "knowledge and understanding of the work, the quality provided by his total proposal and his capability and responsibility to accomplish the project." The solicitation also listed the technical factors and subfactors by which bids would be evaluated:

Factor 1. Past Performance.
Subfactor 1a. Quality of Product and Services.
Subfactor 1b. Customer Satisfaction.
Subfactor 1c. Timeliness of Performance.
Factor 2. Corporate Experience.
Subfactor 2a. Construction Experience with Projects of Similar Type, Size, and Complexity.
Subfactor 2b. Designer Experience with Projects of Similar Type, Size, and Complexity.
Factor 3. Management Plan.
Subfactor 3a. General Management Structure and Plan.
Subfactor 3b. Management of Multiple Subcontractors Including Designer Architect–Engineer.

The solicitation provided that among the technical factors, past performance was the most important, while corporate experience and management plan were of equal importance to each other. The subfactors within each factor category were listed in order of descending importance. The solicitation provided that "[t]he technical evaluation factors, when combined, are more important than price."

The solicitation described in some detail the standards by which past performance, corporate experience, management plan, and price would be evaluated. Regarding the factor of past performance, the solicitation provided:

b. Sheer numbers of confirmed negative comments may not give the offeror an overall rating of less than satisfactory. Negative comments in areas that are not of vital importance to the successful performance of this contract may not result in a rating of less than satisfactory. Conversely, one or only a few negative confirmed comments in areas of vital importance to the successful performance of this contract may render an overall past performance rating less than satisfactory.

c. During the evaluation, the following will also be taken into consideration: the age and relevance of past performance information; the offeror's overall work record; if there are any problems identified, the number, type, and severity of the problems and the effectiveness of corrective actions taken.

In like manner, the solicitation described the qualities that the Corps would consider in its evaluation of an offerors' corporate experience:

For this factor, a project of similar type, size and complexity is considered to be a firing range facility, or a complex of pre-engineered buildings and facilities, with site improvement work and construction similar to a firing range facility, that incorporates most or all of these features: standardized ranges design; modernized target system(s): control tower; latrine facilities; ammunition facilities; classroom facilities; and covered bleacher facilities.

Regarding the third factor, management plan, the solicitation advised offerors to include the following information in their bids:

Subfactor 3a: General Management Structure and Plan. Discuss management structure, design/build strategy and tactics to be used. An organizational chart to detail proposed management structure and chain of command.

Subfactor 3b: Coordination of multiple subcontractors including the designer Architect–Engineer firm. Describe work that will be subcontracted and what work will be done by the offeror's own forces, and how the contractor will coordinate with multiple subcontractors including the design AE to meet schedule requirements.

Finally, the solicitation explained the role of price in the Corps' evaluation of bids:

The right is reserved to accept other than the lowest price offers and to reject any or all offers. Award may be made to the superior proposals, regardless of cost or price, provided that price is determined to be reasonable. The process is designed to ensure the impartial, equitable, and comprehensive evaluation of all technically acceptable, responsible proposals received in response to this particular solicitation.

\* \* \* \* \* \*

In the event, during the course of the analysis, the Price Evaluation Team has reason to question the reasonableness of a price proposal, or has reason to believe there is unbalancing in the price proposal, the PET may conduct such additional reasonable analysis as it requires in order to complete a thorough price analysis. Because the evaluation of the price proposal will represent a portion of the total evaluation, it is possible that an offeror might not be selected because of an unbalanced or an unreasonable price proposal.

According to the solicitation, proposals would be evaluated by separate committees for technical competency and price:

The source selection organization is established as a separate organization and management chain of command whose only purpose is to [select the bid with the best value to the Government]. The organization consists of a Source Selection Authority (SSA) and a Source Selection Evaluation Board (SSEB). The SSEB is comprised of separate Technical Evaluation and Price Evaluation teams.

\* \* \* \* \* \*

The source selection procedures will begin with an initial review of proposals and continue with a technical and price evaluation conducted by the SSEB. The SSEB shall evaluate the proposals based solely on the evaluation criteria identified in [the solicitation]. The results of the SSEB evaluations will be presented to the SSA, who will rank the proposals based on the Best Value to the Government, price and

other factors considered. The SSA will either make the final source selection decision or determine whether it is appropriate to engage in clarifications or communication prior to establishment of a competitive range, or to establish a competitive range and conduct discussions with those offerors that are included in the competitive range. The Government intends to award without discussions.

Included with the solicitation was a five-page "Past Performance Evaluation Questionnaire." The solicitation provided that past performance questionnaires "must be completed by personnel for whom the offeror has performed work" and that offerors should submit questionnaires concerning "recent government or private contracts that have been completed or are currently ongoing." The past performance evaluations required an offeror's references to describe the type and complexity of the work performed by the offeror and to rate the offeror's performance in the categories of "quality of product/service," "customer satisfaction," and "timeliness of performance." The questionnaires stated that "[t]he contracting office will not ... provide your name or copies of this questionnaire to the contractor or any other party not directly involved in the evaluation of the contractor's proposal."

The Corps received three proposals in response to the solicitation, including one from CSE and one from KCI.[3] Copies of CSE's and KCI's price and technical proposals are included in the administrative record. CSE's technical proposal, dated August 6, 2002, included descriptions of seventeen of CSE's construction projects. Five of the project descriptions related to contracts worth over $1,000,000.00, and one project description related to CSE's construction of "a 16–lane, 112 target Automated Record Night Fire Range at Camp Crowder in Neosho, MO." CSE's technical proposal also included a profile of CSE's proposed design subcontractor, Missouri Engineering Corporation. The Missouri Engineering profile consisted of a brief history of Missouri Engi-

---

3. The third proposal was submitted by Artisan Contracting, Inc., and is of limited relevance to the present bid protest case.

neering Corporation, short biographies of the company's principal managers and staff, and a list of the company's previous design projects, including project references' names and telephone numbers. Finally, CSE's technical proposal presented a "General Management Structure and Plan," which included an organizational management flowchart and preliminary schedule for contract performance.

CSE's price proposal included a general cost summary and detailed cost breakdowns for buildings, site work, and utilities. CSE's general cost summary provided the following itemization for expected project costs:

**PROPOSAL SCHEDULE**

| DESCRIPTION | AMOUNT |
| --- | --- |
| **PN 23301—UPGRADE NIGHT FIRE RANGE** | |
| Design Work for Night Fire Range | $ 70,800.00 |
| Night Fire Range Buildings | $ 489,481.00 |
| Site Work for Night Fire Range | $ 211,550.00 |
| Utility Work for Night Fire Range | $ 653,419.00 |
| **PN 16032—AUTOMATIC FIRE RANGE** | |
| Design Work for Automated Record Fire Range | $ 70,800.00 |
| Automated Record Fire Range Buildings | $ 482,342.00 |
| Site Work for Automated Record Fire Range | $ 411,761.00 |
| Utility Work for Automated Record Fire Range | $ 168,563.00 |
| **TOTAL** | **$2,558,716.00** |

CSE also prepared a more detailed breakdown of its price proposal, relying on the "RS Means" building construction cost data book to prepare its estimate.

KCI submitted its technical proposal to the Corps on August 8, 2002. KCI's technical proposal included descriptions of nine of KCI's previous construction projects. The prior projects described in KCI's proposal ranged in value from $6,534,347.00 to $45,000,000.00. One of KCI's past project descriptions concerned the renovation of firing ranges at Fort Leonard Wood, Missouri, the site of the contract at issue in this case. KCI's technical proposal also described design projects undertaken by its proposed design subcontractor, Black and Veatch Special Projects Corporation, and included project references' names and telephone numbers. Among the projects described in Black and Veatch's profile were the design of an air marshal training facility, the design of a "small arms weapons training complex," and the design of security enhancements for Fort Greely, Alaska. Finally, KCI's proposal included a management plan comprising an organizational management flowchart and a plan for assigning work among subcontractors.

KCI's price proposal, also submitted on August 8, 2002, included a general itemization of estimated project costs:

**PROPOSAL SCHEDULE**

| DESCRIPTION | AMOUNT |
| --- | --- |
| **PN 23301—UPGRADE NIGHT FIRE RANGE** | |
| Design Work for Night Fire Range | $ 250,000.00 |
| Night Fire Range Buildings | $ 700,000.00 |
| Site Work for Night Fire Range | $ 200,000.00 |
| Utility Work for Night Fire Range | $1,275,000.00 |
| **PN 16032—AUTOMATIC FIRE RANGE** | |
| Design Work for Automated Record Fire Range | $ 250,000.00 |
| Automated Record Fire Range Buildings | $ 700,000.00 |
| Site Work for Automated Record Fire Range | $1,000,000.00 |
| Utility Work for Automated Record Fire Range | $ 500,000.00 |
| **TOTAL** | **$4,875,000.00** |

On August 7, 2002, the Corps prepared an independent "Final Government Estimate" for the cost of the Fort Leonard Wood firing range renovations. The Corps estimated that the entire construction project would cost $4,325,100.00. The Corps' estimate was based on the following itemization of estimated project costs:

**PROPOSAL SCHEDULE**

| DESCRIPTION | AMOUNT |
| --- | --- |
| **PN 23301—UPGRADE NIGHT FIRE RANGE** | |
| Design Work for Night Fire Range | $ 133,400.00 |
| Night Fire Range Buildings | $ 995,800.00 |
| Site Work for Night Fire Range | $ 504,000.00 |
| Utility Work for Night Fire Range | $ 411,600.00 |
| **PN 16032—AUTOMATIC FIRE RANGE** | |
| Design Work for Automated Record Fire Range | $ 155,800.00 |
| Automated Record Fire Range Buildings | $1,006,300.00 |
| Site Work for Automated Record Fire Range | $ 774,900.00 |
| Utility Work for Automated Record Fire Range | $ 343,400.00 |
| **TOTAL** | **$4,325,100.00** |

As is evident from these figures, the official government estimate for the cost of the Fort Leonard Wood firing range renovations was

$1,766.384.00 greater than CSE's estimate, and $549,900.00 less than KCI's estimate.

According to the "Source Selection Plan" prepared by the Corps, the SSEB established a Technical Evaluation Team (TET) to evaluate offerors' technical proposals. Each member of the TET evaluated the offerors' technical proposals according to the technical factors and subfactors set out in the solicitation. Proposals were rated for each technical subfactor as either "excellent," "very good," "satisfactory," "marginal," or "unacceptable." After TET members' individual evaluations were complete, the TET "convene[d] as a group to review individual evaluations, discuss their respective ratings, and reach a consensus on each subfactor and element." The TET's consensus ratings for CSE and KCI on each technical factor and subfactor were as follows:

| Past Performance [4] | CSE | KCI |
|---|---|---|
| Quality of Product and Service | Very Good | Very Good |
| Customer Satisfaction | Very Good | Very Good |
| Timeliness of Performance | Very Good | Satisfactory |
| **Corporate Experience** | | |
| Construction Experience | Satisfactory | Very Good |
| Designer Experience | Marginal | Excellent |
| **Management Plan** | | |
| General Management Structure and Plan | Marginal | Satisfactory |
| Coordination of Subcontractors | Satisfactory | Satisfactory |

In addition to providing for the technical evaluation of proposals, the Source Selection Plan also directed the SSEB to establish a Price Evaluation Team (PET) for the purpose of reviewing offerors' price proposals "for reasonableness and possible unbalanced bidding." Like the TET, the PET issued a consensus price evaluation after reviewing the price evaluations of individual PET members. According to the consensus evaluation, CSE's price proposal amounted to 59.2 percent of the government estimate, whereas KCI's price proposal amounted to 112.7 percent of the government estimate.[5] Based on their review and on the price proposals offered, the PET concluded:

It is advised that the low proposal by (CSE) be ask [sic] to verify their proposal. If this proposal is verified, it is believed there is sufficient reason to not consider the proposal fair and reasonable based on technical evaluation criteria in the RFP.

Likewise, it is not reasonable to define the two high firms (KCI and Artisan) as not fair and reasonable.

While there is significant variation in the individual bid items, there is not specific indication of unbalanced bidding.

... Proposals from KCI and Artisan Contracting Inc. all represent fair and reasonable cost to the Government. From the standpoint of price, the most desirable is "KCI" with next being "Artisan".

On August 27, 2002, Charlene A. Points, the SSA, issued a final comparative evaluation of the proposals submitted by CSE and KCI. According to the final evaluation, the SSA decided that KCI's proposal represented the best value to the government based on the technical and price evaluations performed by the TET and PET:

As Source Selection Authority for this acquisition, I have determined the services proposed by KCI Construction Company provide the best overall value to satisfy

---

4. The final evaluation report issued by the SSEB on August 14, 2002 indicates that the Corps received seven completed Past Performance Evaluation Questionnaires for CSE and eight completed Questionnaires for KCI.

5. Artisan Contracting, Inc. submitted a bid of $4,910,256.29, which amounted to 113.5 percent of the government estimate.

Government requirements. This selection was made based upon the factors and subfactors established in the solicitation "Proposal Evaluation and Contract Award" criteria and my integrated assessment and comparison of the strengths, weaknesses, and risks of the proposals submitted in response to the solicitation.

Ms. Points' final evaluation compared the strengths and weaknesses of the proposals submitted by CSE and KCI:

1) KCI's technical proposal was the strongest compared to all other proposals. KCI demonstrated satisfactory to very good in the area of Past Performance. KCI's Corporate Experience evaluation received the highest of all other proposal's [sic] with very good and excellent. The evaluation received for KCI's Management Plan indicated their firm is considered satisfactory in the areas of "general management structure and management of multiple subcontractors". KCI's price proposal was ranked number two among the three proposals. Based on their highest rated technical proposal and most reasonable price proposal, KCI Construction Company is considered to be the best qualified offeror for this project.

2) CSE's technical proposal for Past Performance was very good overall. CSE received a marginal and satisfactory rating in the subfactors for Corporate Experience. The projects submitted for design experience were projects for which Missouri Engineering Corporation was responsible. CSE was rated satisfactory in Construction. CSE's price proposal was significantly below both the Government Estimate and all other proposals. CSE was the lowest priced proposal at 59% of the Government Estimate. This price proposal is too low and reflects a lack of understanding of the requirements of this project[.] CSE is considered to be the second best qualified offeror for this effort.

However, with the two subfactor rankings of "marginal", and an unreasonably low price, I am unwilling to select this proposal.

KCI was awarded the Fort Leonard Wood firing range construction contract on August 27, 2002 in the amount of $4,875,000.00. Nicholas Barrack, the founder and president of CSE, stated in an April 16, 2003 affidavit that he first received notice of the award to KCI, and of the $2,316,784.00 disparity between CSE's and KCI's bids, on August 27, 2002. In a September 6, 2002 letter of protest to the General Counsel of the Government Accounting Office (GAO), Mr. Barrack stated:

We are formally protesting the award of the above referenced project to KCI Construction Co., Inc. on August 21, 2002 for $4,875,000. Our quote for the project was $2,558,716.

This project was an RFP so it is understood that a minor difference in price can be outweighed by a major difference in experience or ability. In this case, the price difference of nearly double ($2,316,-284.00) could not outweigh the difference in ability to do the project. Even though KCI Construction Co., Inc. is a very large business, that in no way means they can do a better job than a smaller business. We have successfully completed other projects of this type and size and, in fact, have built an entire range much more complex than this one.

KCI Construction Co., Inc. has an office in Ft. Leonard Wood and presumably has more experience working with the Corps of Engineers than we do. I'm sure they know and have worked with a lot of government personnel at Ft. Leonard Wood, but these relationships cannot be a justification for spending over $2.3 million extra of our tax dollars.[6]

6. In a letter to the GAO dated September 19, 2002, Rick Grebel, President of KCI, states:

We ... do not have an active project at Fort Leonard Wood which could have been mistaken for an office. The fact is that we have worked at Fort Leonard Wood from time to time over the last 20 years and have never requested to be awarded, nor ever been award-ed a project because of our relationships. We believe the statement made by CSE has no merit and the award is based solely upon our submission of the most responsive proposal to the solicitation. This is further supported by the fact that KCI has made several proposals on projects at Fort Leonard Wood over the last

In response to CSE's bid protest, the Corps wrote to KCI on September 11, 2002 directing KCI not to "incur any cost related to this contract, beyond that of the performance and payment bonds already submitted." On September 17, 2002, the GAO dismissed CSE's September 6, 2002 protest on the grounds that "CSE's protest does not include sufficient factual information to establish the likelihood that the agency in this case violated applicable procurement laws or regulations."

In a letter to the General Counsel of the GAO dated September 12, 2002, Mr. Barrack refiled CSE's protest of the Corps' award of the Fort Leonard Wood construction contract to KCI. In the September 12, 2002 protest, Mr. Barrack alleged that, "by awarding this project to another bidder, the Source Selection Authority (SSA) clearly abused her discretion." In support of CSE's protest, Mr. Barrack submitted to the GAO a discussion of CSE's technical and price ratings. Regarding the PET's evaluation of CSE's price proposals, Mr. Barrack stated:

> Since the PET was concerned that we made a mistake in our bid, the solicitation allowed them to request a breakdown of costs so that our pricing could be scientifically and mathematically evaluated .... The PET did not request this information and apparently simply assumed we made a mistake based on the other two bids and the government estimate. No mistake, however, was made. We contend, given our successful record with past projects, the PET should have requested a breakdown of costs which would have confirmed this.

On September 12, 2002, Jon Schenk, Project Manager for KCI, informed the Corps that Mr. Barrack had offered to withdraw CSE's bid protest if KCI would agree to award CSE approximately $1,000,000.00 worth of the utility work on the Fort Leonard Wood renovations. In a letter provided by facsimile copy to Dawn Wade, Assistant District Counsel for the United States Army Corps of Engineers, Kansas City District, on September 12, 2002, Mr. Schenk stated:

> few years in which we were found not to have

[E]nclosed is a faxed proposal sent today from CSE Construction. As discussed, this morning Mr. Nick Barrack, President of CSE telephoned me stating that he had issued a protest of award on the [Fort Leonard Wood] project. He then continued by stating that if KCI Construction would award the utilities package to CSE as a subcontractor, that CSE would drop their protest of award. The enclosed proposal was faxed later in the morning as written confirmation of the subcontract CSE desired KCI to issue in exchange for them dropping their protest.

For the record, we never agreed to accept any such proposal.

Upon learning of CSE's subcontracting proposal to KCI, Charlene Points, the SSA for the Corps, wrote to Mr. Barrack on September 12, 2002 to inform him that "[i]t appears to me that you are improperly using the bid protest system in order to gain a competitive advantage and compromise the integrity of this procurement." Ms. Points further advised Mr. Barrack to "consult with an attorney who is experienced in federal governments [sic] contracts and bid protests." In response to Ms. Points' letter, Mr. Barrack wrote, also on September 12, 2002, that CSE was "in no way trying to gain a competitive advantage or compromise the integrity of the procurement process." Mr. Barrack stated that far from being an abuse of the bid protest process, CSE had intended the September 12, 2002 proposal to KCI merely as

> a compromise effort on my part to avoid the time and cost of a protest. I did this *only* because you and your staff so strongly desired that a protest be avoided. As I said repeatedly during our conference call, we expect to profit $350,000 on this project and that's not something we can just walk away from.

(Emphasis in original.)

On December 16, 2002, the GAO sustained CSE's bid protest. In sustaining CSE's protest, the GAO concluded that the Corps had failed to properly count CSE's low bid in CSE's favor when evaluating proposals:

> submitted the most responsive proposal.

[T]he record establishes that CSE's proposal was not considered for award by the SSA based primarily upon her judgment that CSE's proposed price was unreasonably low and reflected a lack of understanding of the contract requirements. That is, although CSE was considered to be the "second best qualified offeror," CSE was not selected because of its two marginal ratings and "unreasonably low" price. In performing the price/technical tradeoff required by the RFP, the SSA did not consider CSE's significantly lower price to be an advantage to be weighed against the awardee's higher technical rating. We think that if CSE's price advantage had been properly weighed in the agency's price/technical tradeoff analysis, it would have had a reasonable possibility of being selected for award.

*CSE Constr.*, Comp. Gen. Dec. B–291268.2, 2002 CPD ¶ 207, at 5–6, 2002 WL 31835783 (citations omitted). The GAO also noted that if the Corps had determined that CSE's low price reflected unfavorably on CSE's responsibility, then the Corps should have referred the matter to the Small Business Administration (SBA):

The agency's apprehension that CSE's price was too low would appear to concern the firm's responsibility, that is, whether CSE could satisfactorily perform at its proposed price, or whether CSE may have made a mistake in its proposed price. Since CSE is a small business concern, if the agency believed that CSE could not satisfactorily perform the contract at its proposed price, the Corps was required to refer this finding of non-responsibility to the Small Business Administration (SBA) for that agency's review under its certificate of competency procedures. If the agency believed CSE had made a mistake in its proposed price, it was required to request that CSE verify its price. As noted above, the agency did not request verification here.

*CSE Constr.*, Comp. Gen. Dec. B–291268.2, 2002 CPD ¶ 207, at 5, 2002 WL 31835783 (citations omitted).

Finally, the GAO stated that it could find no evidence to support CSE's and KCI's disparate ratings on the technical subfactor of General Management and Structure Plan:

Given that a "marginal" rating reflected a proposal that lacked detail and left issues requiring clarification, we fail to see why KCI received a higher rating than CSE under this factor. Indeed, our review of the record, including the proposals, suggests that both proposals' responses in this area were similarly sparse. Accordingly, we think that the Corps should review its evaluation ratings under this subfactor and ensure that the two firms are treated equally.

*CSE Constr.*, Comp. Gen. Dec. B–291268.2, 2002 CPD ¶ 207, at 7, 2002 WL 31835783 (citations omitted).

In accordance with the GAO's decision, the Corps sent a letter to Mr. Barrack on January 14, 2003 requesting CSE to verify its price proposal. On January 17, 2003, Mr. Barrack wrote to inform the Corps that CSE had reviewed its bid and concluded that its figure was correct:

I am in receipt of your letter of January 14, 2003 and hereby acknowledge that we have carefully reviewed our bid and determined that it is accurate as sent. We have also commissioned an independent "means book" estimate for the project, and this further proved that our price is correct.

Upon receipt of CSE's verification of its bid, the Corps began a "price realism analysis" to determine the reasonableness of CSE's proposal. In a detailed memorandum dated February 8, 2003, Raymond W. Martin, leader of the PET, identified over forty errors in CSE's original price proposals.

On February 14, 2003, Charlene Points sent a letter to the SBA summarizing the conclusions of the Corps' price realism analysis and requesting the SBA to make a responsibility determination, as recommended by the GAO in its December 16, 2002 decision:

As contracting officer, I have determined that CSE Construction's proposal on Solicitation No. DACA 41–02–R–0006 is nonresponsible as to several elements, detailed below. CSE is a small business. Accordingly, pursuant to FAR 19.602–1, I

am requesting SBA to make a responsibility determination.

Solicitation No. DACA 41–02–R–0006 is for the upgrade of night firing and record ranges at Ft. Leonard Wood, Missouri. My first reason for finding CSE nonresponsible is the price it offered, which is significantly below both the government estimate and the other two prices offered. Its price is so low that I believe it is indicative of CSE's failure to understand this project. Secondly, this is a design-build project. It is undisputed that the designer selected by CSE has no experience whatsoever with firing ranges. This alone makes CSE's proposal nonresponsible. Third, I do not believe that CSE's proposal demonstrates that it can successfully administer a design-build contract. I am very concerned that award of this project to CSE would result in a failed project.

I advised CSE that I believed that its price was too low and asked it to verify its bid. It did so. I then requested a cost realism analysis of CSE's price. This has been completed and confirms that CSE's price is too low by over $1,196,353.00. CSE's financial report shows that CSE is not in a position to absorb a loss of this magnitude.

On February 19, 2003, the SBA contacted Mr. Barrack to inform him of the Corps' decision:

> The purpose of this letter is to advise you that the Contracting Officer at the U.S. Army Corps of Engineers in Kansas City, Missouri, has determined your business to be "nonresponsible" and therefore proposes to reject your business' offer on the subject solicitation. The finding of nonresponsibility was based on the Contracting Officer's belief that your business underbid the job, that the proposed design subcontractor lacks experience with firing ranges, and that CSE's proposal did not demonstrate that it could successfully administer a design-build contract.
>
> The Small Business Administration (SBA) has been notified of the nonresponsibility determination so it may offer your business the opportunity to apply for a Certificate of Competency (COC). If you choose to apply for a COC [Certificate of Competency], SBA will perform an independent review of your operations in order to determine whether or not it will issue a COC on your business' behalf. If you choose to participate in the COC review and the SBA does issue a COC on your business' behalf, your business will, virtually without exception, be awarded the contract in question.

The administrative record includes CSE's "Application for Certificate of Competency," dated March 19, 2003. Like CSE's bid proposal, CSE's COC application included a brief history of the company and biographies of the company's principal managers, a list of CSE's projects and project references, a management plan and price proposal for the Fort Leonard Wood firing range renovations, and a profile of CSE's proposed design subcontractor, Missouri Engineering. CSE's COC application also included a detailed statement of CSE's finances.

On March 19, 2003, the SBA issued a "COC Meeting Summary" which described the SBA's review of CSE's COC application. In the COC summary, the SBA addressed the Corps' concerns that CSE had underbid the Fort Leonard Wood construction by "over $1 million," had engaged a design subcontractor, Missouri Engineering, which was insufficiently experienced to perform to expectations, and had failed to exhibit the capability to administer a design-build contract:

> The applicant intends to subcontract the design portion of the contract to Missouri Engineering Corporation. The design firm does not have experience designing firing ranges .... The design firm's lack of experience with firing ranges was a concern to the Committee.

> Despite the COE's [Corps'] concerns, the applicant is convinced his quoted price is adequate. Most of the applicant's bid was developed from his experience in 1993 building the firing range for the Missouri National Guard. The applicant then used the Means Book to confirm his estimates. After the COE expressed such concern about him potentially having underbid the job, he hired an outside firm to re-estimate

the job for him. The outside firm's estimate came within $50,000 of his original bid so the applicant is sticking by his original bid.

\* \* \* \* \* \*

Financial review of the applicant revealed that the company is financially solid and the applicant has about $500,000 available on its line of credit. It appears that if the applicant were to begin performance on the subject procurement and then discovered that he had underbid the job by a[sic] $1 million as the COE fears, it appears the applicant does have the financial capability to complete the job at a loss. However, such a scenario would mean financial ruin for the applicant.

The COC summary also described the background research the SBA had conducted into CSE's past performance:

SBA contacted three of the applicant's open contracts for references. The first contract with the Missouri Department of Transportation for construction of two buildings ($729,000) is in liquidated damages. The second contract with the City of Rolla, Missouri for the replacement of curbs and gutters ($180,552) is currently behind schedule. The contact person for the third contract to erect a diesel pump building ($204,000) indicated the applicant is doing fairly well, but indicated the applicant seems to have difficulty with timing, that they get started, then get behind, and then try to catch up. The contact person also noted that quality control is not perfect. The applicant's less than favorable references were a major concern to the Committee.

The SBA concluded that "[b]ased on a thorough review of all available information, and the findings as summarized above, the Committee unanimously found the applicant's credit to be adequate and unanimously found the applicant's capacity to be insufficient." On March 18, 2003, the SBA wrote to inform Mr. Barrack that CSE would not be issued a COC. According to the March 18, 2003 letter,

the "SBA review revealed that your business did not adequately demonstrate satisfactory current performance in a manner sufficient to give this Agency a reasonable assurance that all requirements of this solicitation would be met." On March 24, 2003, the Corps' contracting officer issued KCI a notice to proceed with construction of the Fort Leonard Wood firing ranges.

On March 18, 2003, Mr. Barrack formally protested the SBA's COC denial to the GAO. In the March 18, 2003 complaint to the GAO, Mr. Barrack alleged:

The SBA possibly acted in bad faith, failed to follow its own published regulations, and/or failed to consider vital information bearing on this firm's responsibility due to the manner in which information was presented to or withheld from the SBA by the procuring agency, the U.S. Army Corps of Engineers.

On April 18, 2003, the plaintiff filed a motion in this court seeking a preliminary injunction "staying performance of the Contract pending the resolution of CSE's protest." [7] The court held a hearing on April 21, 2003, after which the plaintiff's motion for a preliminary injunction was denied. Remaining before the court are the plaintiff's claims for declaratory and permanent injunctive relief, and the defendant's cross-motion for judgment on the administrative record.

## DISCUSSION

The plaintiff has filed a post-award bid protest seeking: (1) a permanent injunction enjoining the Corps from allowing continued performance of the Fort Leonard Wood firing range renovation by KCI; (2) a declaratory judgment that the SBA's denial of CSE's application for a COC was arbitrary and capricious; (3) a declaratory judgment that the Corps' determination that CSE was non-responsible was arbitrary and capricious; (4) a declaratory judgment that CSE is presently responsible and eligible for the Fort Leonard Wood contract award; (5) a declaratory judgment that the Corps' order to KCI

---

**7.** The parties have indicated to the court that the GAO dismissed the plaintiff's March 18, 2003 protest "pursuant to the GAO rules." GAO regulations provide that the "GAO will dismiss any case where the matter involved is the subject of litigation before, or has been decided on the merits by, a court of competent jurisdiction." 4 C.F.R. § 21.11(b) (2003).

to proceed with performance of the Fort Leonard Wood contract was arbitrary and capricious; (6) an order setting aside the Corps' notice to KCI to proceed with performance of the Fort Leonard Wood contract; (7) an order setting aside the Corps' award of the Fort Leonard Wood contract to KCI; and (8) an order directing the Corps' contracting officer to award the Fort Leonard Wood contract to CSE. The plaintiff asserts two separate grounds for the declaratory and injunctive relief it seeks. First, the plaintiff alleges that the SBA arbitrarily and capriciously abused its discretion by denying CSE's application for a COC. Second, the plaintiff states that the Corps arbitrarily and capriciously abused its discretion "by blindly relying on SBA's denial as a basis for eliminating CSE and ordering KCI Construction Co. (KCI) to proceed with the performance of the Contract." Neither party has moved to supplement the administrative record. *See* RCFC 56.1(a). The court, therefore, reviews the agency's procurement decision in this case on the basis of the administrative record.

## I. Standard of Review

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and provided the United States Court of Federal Claims with post-award bid protest jurisdiction for actions filed on or after December 31, 1996. *See* 28 U.S.C. § 1491(b)(1)-(4) (2000). The statute provides that post-award protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) stan-

dards, making applicable the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.), *reh'g and reh'g en banc denied* (2003); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001).

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2000).[8] In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit has discussed specifically subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332 n. 5; *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001) ("The APA provides that a reviewing court must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (Supp. V 1999)."); *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1290 (Fed.Cir. 1999).

---

**8.** The full language of section 706 of the APA provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. 5 U.S.C. § 706 (2000).

In *Impresa Construzioni Geom. Domenico Garufi v. United States,* the court wrote:

Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1)[T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure .... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.,* and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner,]* 480 F.2d [1166,] 1169 [(D.C.Cir.1973)]; *Latecoere,* 19 F.3d at 1356.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (selected citations omitted); *see also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

■ A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996); *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001); *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222, *aff'd,* 264 F.3d 1071 (Fed.Cir.2001); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. at 619; *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999). The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

[T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also In re Sang–Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002) ("The agency must present a full and reasoned explanation of its decision .... The reviewing court is thus enabled to perform a meaningful review ....").

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. at 523 (quoting *Honeywell, Inc. v. United States,* 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971))). As stated by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the

ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 1341, 43 L.Ed.2d 433 (1975); *In re Sang–Su Lee,* 277 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir.), *reh'g denied* (2000) ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.") (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed. Cir.1993); *ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 63; *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them.") (citing *Florida Power & Light .Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)); *Redland Genstar, Inc. v. United States,* 39 Fed. Cl. 220, 231 (1997); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 154 (1997); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663 at 672 (1997); *Commercial Energies, Inc. v. United States,* 20 Cl.Ct. 140, 145 (1990) ("In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably.") (citations omitted).

Similarly, in *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed. Cir.1996) (holding that Board of Contract

Appeals should defer to agency's best value decision as long as it is "grounded in reason … even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3, 1994 WL 129008 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted). Bliss has not shown that the Mint abused its discretion in awarding the contract to Pressmasters.

\* \* \* \* \* \*

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings … which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") ....

*E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996); *see also JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.), *reh'g denied* (2002).

■ In a negotiated procurement, contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement …." *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 686 (1985) (citing *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 339–40, 548

F.2d 915 (1977)); *see also Am. Tel. and Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed.Cir.2002), *reh'g en banc denied*, (2003); *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d at 958; *Cybertech Group, Inc. v. United States*, 48 Fed.Cl. at 646 ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."). In *Burroughs Corp. v. United States*, the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation the court in *Sperry Flight Systems Division v. United States*, 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ..." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

*Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); *see also LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir.1995); *JWK Int'l Corp. v. United States*, 49 Fed.Cl. at 388; *ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 64.

The United States Court of Appeals for the Federal Circuit also has stated that:

> Effective contracting demands broad discretion. *Burroughs Corp. v. United States*, 617 F.2d 590, 598 (Ct.Cl.1980); *Sperry Flight Sys. Div. v. United States*, 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); *see NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States*, 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 819 (1989), *aff'd*, 914 F.2d 271 (Fed.

Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Management Servs.*, 573 F.2d at 73, 216 Ct.Cl. 69 ....

*Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d at 958–59; *see also Grumman Data Sys. Corp. v. Dalton*, 88 F.3d at 995; *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed.Cir.1994).

■ The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. As stated by the United States Supreme Court:

> Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on "engineering and scientific" considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.

*Fed. Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600, *reh'g denied*, 405 U.S. 948, 92 S.Ct. 929, 30 L.Ed.2d 819 (1972); *see also Compubahn v. United States*, 33 Fed.Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted); *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985) (Especially "where an agency's decisions are highly technical in nature ... judicial restraint is appropriate and proper.") (citations omitted). As noted above, the question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but rather, whether the conclusions reached by the agency lacked a reasonable basis, and, thus, were arbitrary or capricious.

■ To prevail in a bid protest case, the protester also must demonstrate prejudice. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Ex-

panding on the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General*, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica*, 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, " 'there was a substantial chance that [it] would receive an award-that it was within the zone of active consideration.' ") (citation omitted).

*Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied* (1999) (citation omitted in original); *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1319; *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed.Cir.2002); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332–33; *OMV Med., Inc. v. United States*, 219 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1380 (Fed.Cir.2000). In *Data General Corporation v. Johnson*, the Circuit Court wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract .... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996).

## II. SBA's Denial of the Plaintiff's COC Application

■ The plaintiff alleges that "[i]n denying CSE's application for a COC on the basis of CSE's purported failure to demonstrate an adequate performance record, the SBA acted arbitrarily, capriciously, unreasonably, inconsistently with the record evidence, and contrary to laws and regulations." As an initial matter, it is clear that this court has jurisdiction to review the SBA's denial of the plaintiff's application for a COC pursuant to the court's jurisdiction over bid protests. *See Cavalier Clothes, Inc. v. United States*, 810 F.2d 1108, 1111 (1987) ("The mere fact that the statute [9] commits the 'final disposition' of

---

9. The statute to which the Federal Circuit referred in *Cavalier Clothes* was 15 U.S.C. § 637(b)(7)(A), which in 1987 provided:

> (b) It shall also be the duty of the [Small Business] Administration and it is empowered, whenever it determines such action is necessary—
>
> * * * * * *
>
> (7)(A) To certify to Government procurement officers ... with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract. A Government procurement officer ... may not, for any reason specified in the

preceding sentence preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a *final disposition* to the Administration.

15 U.S.C. § 634(b) (1982) (emphasis added). The current version of 15 U.S.C. § 637(b)(7)(A) is identical to the version in force at the time *Cavalier Clothes* was decided. Prior to the Federal Circuit's decision *Cavalier Clothes*, Claims Court trial judges had disagreed over the meaning and effect of the phrase "final disposition" as it is used in 15 U.S.C. § 637. *Compare Speco Corp. v. United States*, 2 Cl.Ct. 335, 338 (1983) ("The statute gives 'final disposition' of the competency certification of plaintiff to the SBA. 'Final' means final ....") *with Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 520 (1983) ("There is no

the competency certification to the SBA does not immunize from judicial review the refusal to grant a COC."); *Stapp Towing Inc. v. United States,* 34 Fed.Cl. 300, 306 (1995) ("Unquestionably, the Court of Federal Claims has jurisdiction to review the COC determination."). The court reviews the SBA's responsibility determinations under the same "arbitrary and capricious" standard it applies to agency procurement actions brought under 28 U.S.C. § 1491(b). *See, e.g., CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 87 (1998); *Stapp Towing Inc. v. United States,* 34 Fed.Cl. at 312; *C & G Excavating, Inc. v. United States,* 32 Fed.Cl. 231, 241 (1994) (all applying arbitrary or capricious standard to review of an SBA competency determination). The *Stapp* court indicated, however, that it would show special deference when reviewing the merits of an SBA competency determination. *See Stapp Towing Inc. v. United States,* 34 Fed. Cl. at 306 ("[C]ertain deference must be accorded the unique expertise that SBA–DC unquestionably possesses in the area of business responsibility determinations."). Accordingly, this court will overturn an SBA competency determination only if it appears by a preponderance of the evidence "that the SBA's COC decision of nonresponsibility had no rational basis or that, in making the decision, the SBA violated an applicable procurement statute or regulation in a manner prejudicial to the protesting bidder." *Id.; see also Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("[A] plaintiff must prove the arbitrary and capricious nature of the Government's actions by a preponderance of the evidence.").

The complaint cites five separate SBA actions which, the plaintiff contends, show that "the SBA acted arbitrarily, capriciously, unreasonably, inconsistently with the record evidence, and contrary to laws and regulations." The court notes that each of the

actions alleged was taken in connection with the SBA's investigation into CSE's record of past performance. The counts are recited in the complaint as follows:

(a) The SBA unreasonably contacted only three of the dozens of references provided to the SBA in CSE's application for a COC;

(b) The SBA did not base its denial on any evidence that could reasonably lead to a finding that CSE's performance had been "seriously deficient" in any way;

(c) The SBA denied CSE's application without considering in any way whether any perceived negative instances were circumstances properly beyond CSE's control;

(d) The SBA denied CSE's application for a COC without considering in any way whether CSE had taken appropriate corrective action;

(e) The SBA denied CSE's application for a COC without giving the firm reasonable opportunity to clarify the SBA's purported negative findings.

### A. *Plaintiff's claim that the SBA's decision to deny a COC was in violation of applicable statutes and regulations*

■ The plaintiff claims that the SBA, in reaching its decision to deny the plaintiff's COC application, violated applicable statutes and regulations. Exactly which statutes and regulations apply to SBA competency determinations, however, has emerged as a contested issue. The parties disagree over the extent to which the SBA is subject to the Federal Acquisition Regulations (FAR). CSE alleges that the SBA acted in violation of the FAR, specifically FAR 9.104–3(b), during its evaluation of CSE's application for a COC. *See* 48 C.F.R. § 9.104–3(b) (2001).[10]

---

rational basis for construing this protective provision to deny to the small business concern access to a court which is otherwise available to all other business concerns, for relief from adverse actions by the procurement officer or the SBA ...."). In *Cavalier Clothes,* the Federal Circuit settled the controversy in favor of the approach taken by the Claims Court in *Related Industries. See Cavalier Clothes, Inc. v. United*

*States,* 810 F.2d at 1110 ("[W]e reject *Speco* as to the extent that it deems the SBA's denial of a COC as final and unreviewable.").

10. FAR 9.104–3(b) sets out the criteria by which agency evaluators are to judge a offeror's past performance as follows:

Satisfactory performance record. A prospective contractor that is or recently has been seriously deficient in contract performance

The defendant argues that FAR 9.104–3(b) does not apply to the SBA's review of the plaintiff's COC application. In its opposition brief, the defendant cites a Court of Federal Claims opinion, *C & G Excavating, Inc. v. United States,* 32 Fed.Cl. 231, 238 (1994), for the proposition that "... the SBA's own regulations, not the FAR, govern SBA actions with respect to the COC program." From this portion of a single sentence in the court's opinion, the defendant concludes that "[t]he SBA's [COC] determination is not required to comply with the FAR." It is evident, however, that the defendant fundamentally misapprehends both the meaning and scope of the court's holding in *C & G Excavating.*

The court in *C & G Excavating* was asked to decide whether the SBA had the authority "to deny a COC for reasons other than those forming the basis of the contracting officer's nonresponsibility decision." *Id.* at 236. To answer this question, the court first had to determine whether SBA actions with regard to a COC review were governed by the procurement regulations set out in FAR 19.602–2 or by the SBA-specific regulations provided at 13 C.F.R. § 125.5. At the time of the court's decision in *C & G Excavating,* the relevant section of FAR 19.602–2 provided:

(a) Within 15 business days (or a longer period agreed to by the SBA and the contracting agency) after receiving a notice that a small business concern lacks certain elements of responsibility, the SBA will take the following actions:

\*　　\*　　\*　　\*　　\*　　\*

(2) Upon timely receipt of the application and required documentation, send an SBA team to visit the concern to investigate it *only for the specific elements of nonresponsibility that the agency notice specified as lacking,* and to make recommendations to the SBA Regional Administrator.

48 C.F.R. § 19.602–2 (1994) (emphasis added). It was the opinion of the court in *C & G Excavating* that FAR 19.602–2(a)(2) was inconsistent with the SBA regulations at 13 C.F.R. § 125.5(e), which in 1994 provided:

Upon receipt of [notice that a small business concern has been determined to be nonresponsible], SBA personnel then contact the company concerned to inform it of the impending decision, and to offer the opportunity to apply to SBA for a Certificate. A concern wishing to apply advises the SBA regional office for the geographic region within which the concern is located. Upon timely receipt of required documentation, *SBA personnel may be sent to the firm to review the responsibility of the applicant* and make recommendations to the Regional Administrator.

13 C.F.R. § 125.5(e) (1994) (emphasis added). Comparing the FAR with the SBA-specific provision, the *C & G Excavating* court concluded that "a direct conflict exists between FAR § 19.602–2(a)(2) and 13 C.F.R. § 125.5(e), in that the former limits the scope of the site investigation to the elements cited by the contracting officer as lacking, and the latter contains no such restriction."[11] *C & G*

---

shall be presumed to be nonresponsible, unless the contracting officer determines that the circumstances were properly beyond the contractor's control, or that the contractor has taken appropriate corrective action. Past failure to apply sufficient tenacity and perseverance to perform acceptably is strong evidence of nonresponsibility. Failure to meet the quality requirements of the contract is a significant factor to consider in determining satisfactory performance. The contracting officer shall consider the number of contracts involved and the extent of deficient performance in each contract when making this determination. If the pending contract requires a subcontracting plan pursuant to Subpart 19.7, The Small Business Subcontracting Program, the contracting officer shall also consider the pro-

spective contractor's compliance with subcontracting plans under recent contracts.
48 C.F.R. § 9.104–3(b) (2001).

**11.** The procurement regulations at FAR 19.602–2 and SBA regulations at 13 C.F.R. § 125.5 have since been reconciled to correct the defect recognized in *C & G Excavating.* Under the current version of the regulations, the scope of SBA review is not limited to the areas of nonresponsibility cited by the procuring agency. The relevant sections of FAR 19.602–2 now read:

Within 15 business days (or a longer period agreed to by the SBA and the contracting agency) after receiving notice that a small business concern lacks certain elements of respon-

*Excavating, Inc. v. United States,* 32 Fed.Cl. at 239. Faced with a direct conflict between a FAR requirement and an SBA-specific regulation, the court in *C & G Excavating* concluded that the SBA regulation should govern:

> The court can only interpret the regulations as written. The conflict must be resolved in favor of the SBA's interpretation, given its statutory grant of authority to make final competency decisions. Although acknowledging this authority, the FAR make obligatory what the SBA regulations reserve to the agency's discretion. To that extent, the court holds that the SBA may determine in its discretion whether to order on-site investigations of any element of responsibility that is not the subject of a referral.

*Id.* at 242 (citations omitted).

Thus, the court in *C & G Excavating* held that, where a FAR requirement and an SBA regulation directly conflict with regard to the standards set for SBA actions, the SBA provision will generally be preferred. The court's decision is consistent with the well-established principle that " 'considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer ....' " *Id.* at 239 (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

The court's decision in *C & G Excavating,* however, should not be read to exempt the SBA from the operation of every provision of the FAR, as the defendant suggests. Certain FAR provisions, including the amended version of FAR 19.602–2, explicitly apply to SBA competency determinations. *See* 48 C.F.R. § 19.602–2 (2003), *supra* n. 10; *see also* 48 C.F.R. § 19.602–1 (2003) (governing the referral of small business concerns to the SBA for competency review); 48 C.F.R. § 19.602–3 (2003) (providing for the resolution of differences between procuring agencies and the SBA regarding competency determinations); 48 C.F.R. § 19.602–4 (2003) (governing the award of contracts pursuant to the SBA's competency review).

The court in *C & G Excavating* itself applied certain sections of the FAR to the SBA competency determination challenged in that case, observing that the responsibility criteria set out in FAR 9.104–1 are to be utilized by both procuring agencies and the SBA. *See C & G Excavating, Inc. v. United States,* 32 Fed.Cl. at 240 n. 7; *see also* 48 C.F.R. § 9.104–1 (2001). In support of the proposition that the SBA is bound by the responsibility criteria set out in the FAR, the court cited the legislative history concerning the 1977 amendments to the Small Business Act, which established the Certificate of Competency program. *See C & G Excavating v. United States,* 32 Fed.Cl. at 240 n. 7; *see also* Small Business Act, sec. 501, § 8(b), 91 Stat. 553 (1977) (codified as amended at 15 U.S.C. § 637(b)(7) (2000)). The House Conference Report, also cited by the court in *C & G Excavating,* states that "[t]he House bill [1977 H.R. 692] authorizes the SBA to make all determinations regarding the responsibility of a small business concern to perform a specific Government contract. The term 'responsibility' would include all criteria presently used by procurement officers." H.R.

---

> sibility, the SBA Area Office will take the following actions:
>
> \* \* \* \* \* \*
>
> (b) Upon timely receipt of a complete and acceptable application, elect to visit the applicant's facility to review its responsibility.
> (1) *The COC review process is not limited to the areas of nonresponsibility cited by the contracting officer.*

48 C.F.R. § 19.602–2(b)(1) (2003) (emphasis added). The relevant sections of 13 C.F.R. § 125.5 now read:

> (d)(3) Upon receipt of a complete and acceptable application, SBA may elect to visit the applicant's facility to review its responsibility. SBA personnel may obtain clarification or con-

firmation of information provided by the applicant by directly contacting suppliers, financial institutions, and other third parties upon whom the applicant's responsibility depends.

 \* \* \* \* \* \*

> (f)(1) *The COC review process is not limited to the areas of nonresponsibility cited by the contracting officer.* SBA may, at its discretion, independently evaluate the COC applicant for all elements of responsibility, but it may presume responsibility exists as to elements other than those cited as deficient. SBA may deny a COC for reasons of nonresponsibility not originally cited by the contracting officer.

13 C.F.R. §§ 125.5(d)(3), (f)(1) (2003) (emphasis added).

Conf. Rep. No. 535, 95th Cong., 1st Sess. 21 (1977), *reprinted in* 1977 U.S.C.C.A.N. 843, 851 (*quoted in C & G Excavating, Inc. v. United States*, 32 Fed.Cl. at 240 n. 7). The defendant's reading of the court's decision in *C & G Excavating* is plainly contrary to the holding of that case. Contrary to holding that "[t]he SBA's determination is not required to comply with the FAR," the court in *C & G Excavating* explicitly concluded that SBA competency determinations are subject to those provisions of the FAR that set out the criteria by which procuring agencies are to make responsibility determinations.

The defendant's suggestion that the SBA is immune from the application of the FAR to its competency reviews cannot be countenanced, particularly since the SBA regulations at 13 C.F.R. § 125.5 give little guidance regarding the criteria by which COC applications are to be judged. *See* 13 C.F.R. § 125.5 (2001). Moreover, as recognized by the court in *C & G Excavating*, Congress has clearly expressed its intention that the SBA review an applicant's responsibility according to "all criteria presently used by procurement officers." H.R. Conf. Rep. No. 535, 95th Cong., 1st Sess. 21 (1977), *reprinted in* 1977 U.S.C.C.A.N. 843, 851 (*quoted in C & G Excavating, Inc. v. United States*, 32 Fed.Cl. at 240 n. 7).

The criteria "presently used by procurement officers" are set out in various provisions of the United States Code and Code of Federal Regulations. Among these are the FAR provisions at 9.104–1 and 9.104–3. *See C & G Excavating, Inc. v. United States*, 32 Fed.Cl. at 240 n. 7 (applying FAR 9.104–1 to an SBA competency determination); *Reel–O–Matic Systems, Inc. v. United States*, 16 Cl.Ct. 93, 99–100 (1989) (applying FAR 9.104–1 and FAR 9.104–3 to an SBA competency determination). FAR 9.104–1 sets out "general standards" for agency responsibility determinations. 48 C.F.R. § 9.104–1 (2001). Among other relevant factors, FAR 9.104–1 provides that "[t]o be determined responsible, a prospective contractor must . . . [h]ave a satisfactory performance record (see 48 CFR 9.104–3(b) and part 42, subpart 42.15)." 48 C.F.R. § 9.104–1(c) (2001). Factors relevant to past performance evaluations are set

out in FAR 9.104–3(b), quoted in its entirety above. *See* 48 C.F.R. § 9.104–3(b) (2001), *supra* n. 9.

It is also established that agency procurement decisions must adhere strictly to the criteria set out in the solicitation. *See* 10 U.S.C. § 2305(b)(1) (2000) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); *Gulf Group, Inc. v. United States*, 56 Fed.Cl. 391, 397 (2003) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."). This rule applies with equal force to SBA competency determinations, not only because of the legislative intent to bind COC determinations to the same "criteria presently used by procurement officers," but also because of the nature of the COC program itself. The issuance of a COC reflects the SBA's determination that a small business concern is responsible to perform a specific government contract. *See* 15 U.S.C. § 637(b)(7)(A) (2000) (empowering the SBA "[t]o certify to Government procurement officers . . . with respect to all elements of responsibility . . . of any small business concern or group of such concerns to receive and perform a specific Government contract."); 13 C.F.R. § 125.5(a)(1) (2001) ("A COC is a written instrument issued by SBA to a Government contracting officer, certifying that one or more named small business concerns possesses the responsibility to perform a specific Government procurement (or sale) contract."); 48 C.F.R. § 19.601(a) (2001) ("A Certificate of Competency (COC) is the certificate issued by the Small Business Administration (SBA) stating that the holder is responsible . . . for the purpose of receiving and performing a specific Government contract."). Given the contract-specific nature of the COC program, it is both necessary and proper for the SBA to evaluate COC applications according to the criteria set out in the solicitation at issue.

The general standards by which the court reviews SBA competency determinations must be applied in the court's review of SBA evaluations of prospective contractors' past performance. Consistent with the arbitrary

and capricious standard of review, "[a]n agency is accorded broad discretion when conducting its past performance evaluations." *Computer Sciences Corp. v. United States*, 51 Fed.Cl. 297, 319 (2002). In deference to reviewing agencies' discretion, there is no bright-line requirement concerning which or how many past performance references a reviewing agency must contact when conducting a past performance evaluation. *See Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. 560, 567 (2000) ("Agency personnel are generally given great discretion in determining what references to review in evaluating past performance."); *Forestry Surveys & Data v. United States*, 44 Fed.Cl. 493, 499 (1999) ("[A]n agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract."). Similarly, " '[t]here is no requirement that all references listed in a proposal be checked.' " *Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. at 567; *see also HLC Indus. Inc.*, Comp. Gen. Dec. B–274374, 96–2 CPD ¶ 214, at 7, 1996 WL 705198 ("There is no legal requirement that all references listed in a proposal be checked."); *Black & Veatch Special Projects Corp.*, Comp. Gen. Dec. B–279492.2, 98–1 CPD ¶ 173, at 8, 1998 WL 339687 ("[T]here is no legal requirement that all references listed in a proposal be checked."). The court's deference to an agency's discretion in performing past performance evaluations is not, however, without limit, and it is settled law that past performance evaluations are subject to the same APA review as other agency actions challenged in this court on a bid protest. *See Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. at 567 ("[B]ound by the arbitrary and capricious standard of review, the exercise of this discretion obviously must be reasonable ...."). The court's review of an agency's "evaluations of an offeror's technical proposal and past performance should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements." *JWK Int'l Corp. v. United States*, 52 Fed.Cl. at 659.

In the present case, the plaintiff argues that the SBA's review of the plaintiff's past performance did not comply with relevant statutory and regulatory requirements. Relevant to the plaintiff's allegations are the March 11, 2003 report of COC Specialist David Turner and the March 19, 2003 report of the COC Committee. The SBA's past performance reports indicate that the SBA contacted three of CSE's thirty-five most recent references and that these three references proffered "less than favorable" evaluations of CSE's contract performance. The past performance section of the report by COC Specialist David Turner, in its entirety, states:

The following is a summary of the applicant's past/current performance:

**WAYLAND MISSOURI DEPARTMENT OF TRANSPORTATION**—Construction of 2 buildings for $729,000, Todd Roth—*The contract is in liquidated damages.* It was due for completion on February 4, 2003 and they are not finished. They appear to have sufficient skilled labor but lack leadership in project management. They appear to have a lot of little problems between their different trade workers. We had to bring CSE back 4 times to get the work on their punch list completed. Their quality of work is satisfactory but we have been disappointed with their performance.

**CITY OF ROLLA, MISSOURI**—Replacement of curbs and gutters for $180,552, Steve Hargis—They do "fair" work. I couldn't give them a 100%. They are currently behind schedule. I have had trouble keeping them on the job. Some of that could be my fault for not staying on top of them. They could be a little more responsive. Their quality of work is satisfactory.

**EMPIRE DISTRICT ELECTRIC**— Erecting a diesel pump building for $204,000, Joe Simmons—They do "fairly" well. They seem to have difficulty with timing. They get started, then get behind and then come back and try to catch up.

(Emphasis in original.) The COC Committee of the SBA later stated that "[t]he applicant's less than favorable references were a major concern to the Committee." Agency action, however, will not be sustained if taken in

violation of applicable statutes and regulations to the prejudice of the plaintiff. *See Kentron Hawaii, Ltd. v. Warner,* 480 F.2d at 1169; *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d at 1355–56. As discussed above, the SBA is not exempt from but must comply with applicable provisions in the FAR. The court now turns to the plaintiff's specific allegations of illegal action by the SBA.

**1. The plaintiff's charge that the SBA failed to consider the plaintiff's three unfavorable references within the context of the plaintiff's overall work record.**

■ The parties have stipulated that CSE, in its February 25, 2003 application to the SBA for a COC, submitted a list of roughly 105 project references.[12] Of these hundred-plus project references, the parties agree that "35 projects were listed as being performed from the year 2000 to the present."[13] CSE now complains that the SBA contacted only three of those project references during its review of CSE's past performance. CSE charges that the "SBA's superficial 'interviews' of only 3 of the numerous references set out in CSE's application for a COC were not only insufficient in number to satisfy SBA's obligation under FAR 9.104–3(b) but were insufficient in substance and context as well." The court agrees.

As the plaintiff correctly points out, FAR 9.104–3(b) charges agency evaluators to "consider the number of contracts involved and the extent of deficient performance in each contract" when making responsibility determinations. 48 C.F.R. § 9.104–3(b) (2001). The nature and extent of the FAR requirement is informed by the terms of the solicitation, which provided that "the age and relevance of past performance information" as well as "the offeror's overall work record" would be considered during the course of the past performance evaluation. Reading FAR 9.104–3(b) in light of the criteria stated in the solicitation, the court concludes that the SBA

was required to evaluate the significance of the three "less than favorable" references within the context of the plaintiff's "overall work record."

■ It is evident, however, that the SBA made no effort to conduct a more comprehensive and contextual evaluation of the plaintiff's past performance references as contemplated in FAR 9.104–3(b) and in the solicitation. The SBA's cursory inquiry into the plaintiff's past performance was not sufficient to satisfy either FAR 9.104–3(b) or the requirements of the solicitation. FAR 9.104–3(b) and the terms of the solicitation required the SBA to do more than simply note that three of CSE's references provided "less than favorable" reviews of CSE's performance. Part of the SBA's duty in evaluating CSE's past performance was to consider "the number of contracts involved," 48 C.F.R. § 9.104–3(b), as a proportion of "the offeror's overall work record." The court, therefore, concludes that the SBA failed to perform the comprehensive past performance analysis required by the FAR and the solicitation.

Furthermore, the SBA failed to give even the slightest consideration to the Corps of Engineers' determination that the plaintiff had a "very good" performance record. The court, it must be emphasized, does not question the authority of the SBA to conduct its own independent investigation into CSE's responsibility, including those elements of responsibility not cited by the procuring agency as areas of concern. *See* 13 C.F.R. § 125.5(f)(1) (2001); · 48 C.F.R. § 19.602–2(b)(1) (2001) (both regulations state that: "The COC review process is not limited to the areas of nonresponsibility cited by the contracting officer."). Nevertheless, the court shares the plaintiff's concern that "it is not clear how SBA could have reconciled its determination based on only three references with the COE's [Corps'] past performance determination finding CSE to have a 'very good' record of performance based on a significantly more detailed evaluation of seven

---

12. The record refers in some places to a list of 105 references, in other places to a list of 106 or 107 references.

13. In the February 19, 2003 letter which the SBA sent to CSE, informing CSE that its case had

been referred to the SBA by the Corps, the SBA requested "information for each Government contract the business has worked on during the last three years ...."

references." The question, therefore, is whether the Corps was required to supply the SBA with the results of its investigation into CSE's past performance and, if so, whether the SBA was required to give any consideration to the information collected by the Corps concerning CSE's past performance.

The SBA regulations at 13 C.F.R. § 125.5 ("Certificate of Competency Program") provide some guidance:

(c)(1) A contracting officer who determines that an apparently successful offeror that has certified itself to be a small business with respect to a specific Government procurement lacks any element of responsibility (including competency, capability, capacity, credit, integrity or tenacity or perseverance) must refer the matter in writing to the SBA Government Contracting Area Office (Area Office) serving the area in which the headquarters of the offeror is located. The referral must include a copy of the following:

(i) Solicitation;

(ii) Offer submitted by the concern whose responsibility is at issue for the procurement (its Best and Final Offer for a negotiated procurement);

(iii) Abstract of Bids, where applicable, or the Contracting Officer's Price Negotiation Memorandum;

(iv) Preaward survey, where applicable;

(v) Contracting officer's written determination of nonresponsibility;

(vi) Technical data package (including drawings, specifications, and Statement of Work); and

(vii) Any other justification and documentation used to arrive at the nonresponsibility determination.

13 C.F.R. § 125.5(c)(1)(2001). Nearly identical referral requirements are provided at FAR 19.602–1(c). *See* 48 C.F.R. § 19.602–1(c) (2001).

The court finds no ambiguity in the language of FAR 19.602–1 or 13 C.F.R. § 125.5.

Upon referral of a small business concern to the SBA for competency review, the procuring agency is required to submit to the SBA "[a]ny … justification and documentation used to arrive at the nonresponsibility determination." 13 C.F.R. § 125.5(c)(1)(vii) (2001). In the present case, the solicitation described past performance as "the most important" of the technical evaluation criteria. Given the primary importance of past performance to the Corps' technical evaluation of proposals, it is doubtful that the Corps could reasonably have arrived at a determination either of responsibility or of nonresponsibility without considering CSE's past performance. The Corps, however, found CSE nonresponsible, even though the Corps evaluated CSE's past performance as "very good." Charlene Points, the Corps' contracting officer, noted in the formal statement of her decision to award the contract to KCI that "CSE's technical proposal for Past Performance was very good overall," yet concluded that, "with the two subfactor rankings of 'marginal', and an unreasonably low price, I am unwilling to select [CSE's] proposal." Because the references assembled by the Corps during the course of its investigation into CSE's past performance consisted of part of the "justification and documentation used to arrive at the nonresponsibility determination," the court concludes that the Corps was required to submit this information to the SBA upon referring CSE for a competency review. It appears from the record that the Corps failed to meet its regulatory obligation in this regard. The parties have stipulated that the Corps, in its referral of CSE to the SBA, "enclosed the following documents for SBA's consideration: the solicitation, CSE's proposal, the contracting officer's letter asking CSE to verify its bid, CSE's letter verifying that bid, the Cost Engineering Section's cost realism analysis, and a copy of CSE's financial report." Absent from this list are the results of the Corps' review of CSE's past performance, for which it gave CSE a rating of "very good." [14] By

---

14. The parties have stipulated that the Corps' contracting officer "knew the SBA's basis of denial of CSE's COC (as set out in the COC meeting summary), before she issued the Notice to Proceed to KCI." (citation omitted). The SBA's COC meeting summary stated that CSE's "less than favorable references were a major concern to the Committee." Even knowing of the dis-

failing to supply the SBA with relevant past performance information, the Corps violated its obligation under FAR 19.602–1 and 13 C.F.R. § 125.5.

The court is aware that its decision that the Corps was required to supply the SBA with the results of its investigation into CSE's past performance is contrary to some, but not all, of the decisions of the Comptroller General treating the question of a procuring agency's duty to supply the SBA with relevant information upon referral of a small business concern for a competency determination.[15] *Compare Joanell Laboratories, Inc.,* Comp. Gen. Dec. B–242415.16, 93–1 CPD ¶ 207, at 5, 1993 WL 67831 ("We therefore consider a contracting officer's failure, whether inadvertent or intentional, to provide all vital information bearing on a COC matter to be inconsistent with that official's statutory duty to refer 'the matter for a final disposition' to the SBA ....") (quoting 15 U.S.C. § 637(b)(7)(A)) *with R.S. Data Systems,* Comp. Gen. Dec. B–220961, 85–2 CPD ¶ 588, at 2, 1985 WL 50856 ("[T]he contracting officer was not required to supply the SBA with information tending to show that the contractor is responsible ... since the burden is on the contractor to prove through its COC application to SBA that it is responsible.") (citing FAR 19.602–2(a)). The court endorses the position taken by the GAO in *Joanell Laboratories, Inc.* FAR 19.602–1 and the SBA regulations at 13 C.F.R. § 125.5 explicitly require procuring agencies to forward to the SBA any information relevant to the agency's determination that a small business concern is nonresponsible. *See* 13 C.F.R. § 125.5(c)(1)(2001); 48 C.F.R. § 19.602–1(c) (2001). FAR 19.602–2(a), cited by the GAO in *R.S. Data Systems,* imposes upon prospective contractors the burden of affirmatively demonstrating responsibility. The court can find nothing in FAR 19.602–2(a), however, to support the GAO's conclusion in *R.S. Data Systems* that procuring agencies are free to withhold credible, relevant, and readily accessible evidence directly concerning the question of a small business's responsibility. Moreover, the 1985 version of FAR 19.602–1 interpreted by the GAO in *R.S. Data Systems* differs importantly from the version of FAR 19.602–1 in force at the time of the procurement challenged in this case. The relevant section of the 1985 version of FAR 19.602–1 at issue in *R.S. Data Systems* provided that any referral of a small business concern to the SBA for a responsibility determination should include "[a] copy of the solicitation, drawings and specifications, preaward survey findings, pertinent technical and financial information, abstract of bids (if available), and any other pertinent information *that supports the contracting officer's determination.*" 48 C.F.R. § 19.602–1(c)(2) (1985) (emphasis added). In contrast, the version of 48 C.F.R. § 19.602–1 in place at the time of the procurement challenged here required contracting officers to supply the SBA with "[a]ny ... justification and documentation *used to arrive at the nonresponsibility determination.*" 48 C.F.R. § 19.602–1(c)(2)(vi) (2001) (emphasis added). Arguably, the 1985 version of the regulation required contracting officers to forward to the SBA only that information which supported the determination of nonresponsibility. In the court's view, the more expansive language of the 2001 version of the regulation requires contracting officers to forward to the SBA any documentation used to arrive at nonresponsibility determinations. Contracting officers "arrive at" nonresponsibility determinations by weighing all available rele-

crepancy between the SBA's evaluation of CSE's past performance (the major basis for its denial of the COC), and its own view of CSE's past performance (very good), the Corps did not provide the SBA with information on the Corps' broader past performance inquiry.

**15.** Although not binding on this court, GAO decisions are of interest to the court and are often referred to by the court as persuasive authority "in recognition of GAO's expertise in resolving contested procurement decisions." *Tel–Instrument Elec. Corp. v. United States,* 56 Fed.Cl. 174,

177 n. 2 (2003). *See also North Carolina Div. of Servs. for Blind v. United States,* 53 Fed.Cl. 147, 166 n. 13 (2002); *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991) (citing *Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48 (Fed.Cir.1989)); *Howell Constr., Inc. v. United States,* 12 Cl.Ct. 450, 452 (1987) ("[A]lthough a GAO bid protest decision is not necessarily binding on this Court, it is proper and appropriate for the Court to take into account and give deference to the views of the GAO.").

vant information, including that which tends to show an offeror's responsibility. The Corps, therefore, was required under the applicable regulations to supply the SBA with all information in the contracting officer's possession relevant to the question of CSE's responsibility or lack thereof.

Had the Corps satisfied its regulatory duty to supply the SBA with the results of its investigation into CSE's past performance, the SBA would have been obligated to consider this information during its independent review of CSE's past performance. Courts have stated that the COC program "was designed to protect small businesses against discrimination by procurement officers." *Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 521 (1983) (citing *Siller Bros., Inc. v. United States*, 228 Ct.Cl. 76, 81–82, 655 F.2d 1039, 1043 (1981)), *cert. denied*, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982). In the court's view, it is not possible for the SBA to adequately protect small businesses without giving due consideration to the evidence cited by procurement officers in support of their findings of nonresponsibility. Thus, while the court affirms the SBA's authority to conduct an independent investigation into any and all elements of a small business's responsibility, the court cannot endorse the view that the Corps is free to withhold, or the SBA free to ignore, credible evidence, already collected, that is directly relevant to the question of a small business concern's responsibility. In the present case, it appears that a fundamental error was the Corps' failure to supply the SBA with the results of its review of CSE's past performance. The SBA is not without blame, however, since it appears from the record that the SBA was aware that CSE had been rated "very good" by the Corps for the factor of past performance.[16] The SBA's failure to inquire or even mention the discrepancy be-

tween its own and the Corps' findings raises serious doubts as to the adequacy of its review.

In sum, the court concludes that the Corps was required to submit to the SBA "[a]ny . . . justification and documentation used to arrive at the nonresponsibility determination," 13 C.F.R. § 125.5(c)(1) (2001), and the SBA was required to consider this information, as well as the results of its own investigation into CSE's past performance, during its evaluation of CSE's responsibility. Based on the record before the court the Corps and the SBA violated the terms of the applicable regulations and the solicitation.

**2. The plaintiff's charge that the SBA denied CSE's application for a COC without considering whether CSE's past performance problems arose from circumstances beyond CSE's control or whether CSE had taken appropriate corrective action.**

■ In its brief addressing the parties' Joint Statements of Law and Facts, the plaintiff charges that

Mr. Turner, as an SBA Investigator undertaking a COC on behalf of a small business, had a duty to examine and elaborate on each of the statements he deemed negative in order to get a better idea of the scope and magnitude of any perceived problem before assuming the worst to the detriment of CSE. The record reveals, however, that Mr. Turner did nothing to determine whether the circumstances were properly beyond CSE's control . . . . Moreover, to the extent Mr. Turner believed CSE had serious performance problems, he made no attempt to determine whether CSE had taken appropriate "corrective action" to resolve those problems to the satisfaction of its customers.

---

16. Although the SBA was not in possession of the underlying data collected by the Corps, CSE's technical ratings by the Corps, including the "very good" rating it received for the factor of past performance, are set out in the December 16, 2002 decision of the GAO sustaining CSE's initial protest, which was included in the record presented to the SBA. *CSE Constr.*, Comp. Gen. Dec. B–291268.2, 2002 CPD ¶ 207, at 3, 2002 WL 31835783. Moreover, the GAO's December 16, 2002 decision is contained twice in the ad-

ministrative record before this court, first in a subsection titled, "CSE Protests to GAO of the Corps' Source Selection Process," and also in a subsequent subsection titled "SBA's Documents on the Certificate of Competency (COC) Process." Defendant prepared and submitted the administrative record, including this portion indicating that the GAO decision, and, thereby, the Corps' past performance rating of CSE, was before the SBA during its consideration of the COC application submitted by CSE.

The plaintiff correctly states the SBA's duties under FAR 9.104–3, which provides that "[a] prospective contractor that is or recently has been seriously deficient in contract performance shall be presumed to be nonresponsible, unless the contracting officer determines that the circumstances were properly beyond the contractor's control, or that the contractor has taken appropriate corrective action." 48 C.F.R. § 9.104–3(b) (2001). The court also notes that the solicitation provided that "the effectiveness of corrective actions taken" in response to performance problems would be "taken into consideration." It is the court's view that these provisions of the FAR and solicitation required the SBA to inquire regarding CSE's unfavorable past performance references whether the problems encountered were properly beyond CSE's control and whether appropriate corrective action had been taken. It is evident from the record, however, and particularly from the reports of the COC Specialist and COC Committee, that no such inquiry was made.

The defendant does not address the plaintiff's charge that the SBA violated applicable regulations by failing to consider whether past performance problems were beyond CSE's control and whether CSE had taken appropriate corrective action, perhaps because the defendant asserts, incorrectly, as discussed earlier, that FAR 9.104–3(b) is inapplicable to COC determinations. The defendant, however, does discuss the issue of burden of proof, concluding that the "[p]laintiff has the burden of establishing its responsibility," and that "CSE's failure to have taken appropriate measures to enable the SBA to obtain information the CSE wanted considered upon its COC application does not invalidate SBA's determination."

The defendant is correct that, as a general matter, "[a] prospective contractor must affirmatively demonstrate its responsibility ...." 48 C.F.R. § 9.103(c) (2001); *see also C & G Excavating, Inc. v. United States*, 32 Fed.Cl. at 244 ("[T]he burden rests with the prospective contractor to demonstrate that it satisfies the criteria underlying a responsibility determination."). The regulatory assignment of the burden of proof to the prospective contractor, however, must be weighed against the SBA's authority to certify, and affirmative duty, independently, to evaluate, a COC applicant as to all elements of responsibility following a referral. *See* 48 C.F.R. § 19.601(b) (2001) ("The COC program empowers the Small Business Administration (SBA) to certify to Government contracting officers as to all elements of responsibility of any small business concern to receive and perform a specific Government contract."); *C & G Excavating, Inc. v. United States*, 32 Fed.Cl. at 241 ("[T]he SBA would be remiss if it did not evaluate all factors comprising the responsibility determination."); *see also* 48 C.F.R. § 19.602–2(b)(2) (2001) (permitting the SBA to "presume responsibility exists as to elements *other than those cited as deficient*") (emphasis added).

In the February 19, 2003 letter informing the plaintiff of its opportunity to apply for COC, the SBA directed CSE to provide sufficient past performance information to allow the SBA to initiate and conduct its own past performance investigation:

> Provide the following information for each Government contract the business has worked on during the last three years:
> a. Contract number
> b. Dollar value
> c. Services provided
> d. Name of the Government agency
> e. Contact persons with telephone numbers
> f. Current status

In its request for information from the plaintiff, the SBA asked for contact information for prior contracting partners, presumably in order to conduct its own investigation into the plaintiff's past performance. The plaintiff, however, was not able to provide the SBA with the information assembled by the Corps regarding the Corps' responsibility assessment.

The SBA had a duty to evaluate the plaintiff's past performance in a manner consistent with the solicitation and applicable regulations. The court will not construe the plaintiff's burden of proof as a license for the SBA to conduct an inadequate investigation into elements of responsibility which it pur-

ports to evaluate. Accordingly, the court concludes that the SBA's failure to consider whether CSE's past performance problems arose from circumstances beyond CSE's control and whether CSE took appropriate corrective action to remedy these problems constituted a violation of the SBA's obligations under both the solicitation and FAR 9.104–3(b).

**3. The plaintiff's charge that the SBA denied the plaintiff's application for a COC without giving the plaintiff "reasonable opportunity to clarify the SBA's purported negative findings."**

■ Although the complaint lists as one of the SBA's allegedly wrongful acts the agency's failure to allow CSE to clarify the unfavorable past performance references the SBA had collected, the plaintiff does not pursue this claim in its "Brief Addressing the Joint Statements of Law and Facts," and for good reason. The claim is rejected. Nothing in the applicable statutes or regulations requires the SBA to afford an unsuccessful applicant opportunity to respond to a finding of nonresponsibility. Although not ideal, perhaps because of tight procurement timelines, courts consistently have rejected attempts to impose a burden on the SBA to seek clarification from unsuccessful COC applicants. *See CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 89 (1998) ("An often repeated complaint by plaintiff is that Roncaglio never asked for additional information or sought clarification from [the plaintiff] with respect to [the plaintiff's] COC application. The court finds no merit to this complaint."); *C & G Excavating, Inc. v. United States,* 32 Fed.Cl. at 246 ("The SBA cannot be required to request additional information when the applicant simply did not put forth the requisite effort to complete satisfactorily the COC application."). The court does not believe that requiring the SBA to seek "clarification" from unsuccessful COC applicants is necessary to ensure that the SBA would reach fair and accurate competency determinations. The court is confident that diligent SBA competency evaluations, which conform to the applicable statutory and regulatory requirements, could adequately ensure the fair and impartial operation of the COC program.

**B. *Plaintiff's claim that the SBA's violation of relevant statutes and regulations resulted in prejudice to the plaintiff***

■ The plaintiff claims that "[i]n denying CSE's application for a COC on the basis of CSE's purported failure to demonstrate an adequate performance record, the SBA acted ... contrary to laws and regulations. This unlawful action is to the great prejudice of CSE ...." The court has determined that the SBA violated applicable statutory and regulatory requirements, including the requirement that responsibility determinations conform to the criteria stated in the solicitation, by (1) failing to consider CSE's unfavorable past performance references within the context of CSE's overall work record, and (2) failing to consider whether the problems CSE encountered were beyond CSE's control and whether CSE took appropriate corrective action. When a government contract award is challenged on the ground that the award was made in violation of applicable statutes and regulations, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d at 1169). The court must, therefore, decide whether the SBA's noncompliance with applicable statutes and regulations resulted in prejudice to the plaintiff.

It is settled law that "[t]o establish prejudice, a protestor must demonstrate that but for the alleged error, there was a substantial chance it would have received the award." *Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 306 (2002) (citing *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir. 1996)). The United States Court of Appeals for the Federal Circuit has emphasized that the "substantial chance" test does not require a showing that but for the error, the plaintiff would, in fact, have been awarded the contract. Rather, the Federal Circuit has noted:

the disappointed bidder need demonstrate only that if its bid had been fairly and honestly considered, "there was a substan-

tial chance that [it] would receive an award-that it was within the zone of active consideration." *[Morgan Business Assocs. v. United States,* 223 Ct.Cl. 325, 332, 619 F.2d 892, 895 (1980).]. This "principle of liability" both "vindicates the bidder's interest and right in having his bid considered" and "at the same time forestall[s] a windfall recovery for a bidder who was not in reality damaged." *[Id.]*

*C.A.C.I., Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983).

The SBA is authorized to make the binding, final evaluation of a small business as to all elements of responsibility, and a decision by the SBA to issue a COC normally determines that the contract will be awarded to the successful COC applicant. *See* 15 U.S.C. § 637(b)(7)(C) ("In any case in which a small business concern or group of such concerns has been certified by the [Small Business] Administration ... to be a responsible or eligible Government contractor as to a specific Government contract, the officers of the Government having procurement ... powers are directed to accept such certification as conclusive, and shall let such Government contract to such concern or group of concerns without requiring it to meet any other requirement of responsibility or eligibility."); 48 C.F.R. § 19.602–4(b) (2001) ("The contracting officer shall award the contract to the concern in question if the SBA issues a COC after receiving the referral. An SBA-certified concern shall not be required to meet any other requirements of responsibility. SBA COC's are conclusive with respect to all elements of responsibility of prospective small business contractors."). Given the SBA's role as the final arbiter of a small business's responsibility, the plaintiff's burden when seeking to overturn an SBA decision to deny a COC is to demonstrate that but for the alleged unlawful error, there was a substantial chance the plaintiff would have been issued a COC.

Had the SBA conducted its evaluation of the plaintiff's COC application in accordance with the applicable statutes, regulations, and solicitation criteria, there was a substantial chance that the plaintiff would have been issued a COC. The COC Committee, in denying the plaintiff's application, stated that "[t]he plaintiff's less than favorable references were a major concern to the Committee." As discussed above, the SBA's investigation of the plaintiff's past performance was seriously defective. The SBA failed to consider the plaintiff's unfavorable references in light of the plaintiffs overall work record, failed to consider relevant and credible past performance information collected by the Corps, failed to inquire whether CSE's past performance problems had been beyond CSE's control, and failed to inquire whether CSE had taken appropriate corrective action in response to the problems reported. These defects clearly suggest plaintiff had a substantial chance of receiving the COC. Consideration of factors such as whether performance problems had been beyond CSE's control or whether CSE had taken appropriate corrective action in response to problems could have tended to mitigate CSE's unfavorable references. Moreover, it would undoubtedly have been to the plaintiff's benefit for the SBA to consider the Corps' more extensive past performance findings, since the Corps' survey of seven references led it to conclude that the plaintiff had a "very good" record of past performance. The SBA's investigation of CSE's past performance, therefore, not only violated applicable statutes and regulations, but did so in a manner detrimental to the plaintiff.

The court is aware that the plaintiff's unfavorable past performance evaluation was not the only reason cited by the SBA in support of its denial of the plaintiff's COC application. The COC committee also noted that "[t]he design firm's [Missouri Engineering Corporation's] lack of experience with firing ranges was a concern to the Committee." When deciding whether unlawful agency action resulted in prejudice to a plaintiff, however, the court need not conclude that the plaintiff would, in fact, have been awarded the contract if not for the unlawful agency action. To find for the plaintiff, the court need only conclude that but for the unlawful agency action, the plaintiff would have had a substantial chance of being awarded the contract or, in this case, the COC. *Computer Sciences Corp. v. United States,* 51 Fed.Cl. at 306

(citing *Statistica, Inc. v. Christopher,* 102 F.3d at 1581).

The COC Committee report indicates that the CSE's unfavorable past performance references were a "major concern" to the Committee, whereas Missouri Engineering Corporation's lack of experience was merely "a concern." In addition, the SBA, in its March 18, 2003 notice informing CSE that its COC had been denied, stated only that "[CSE] did not adequately demonstrate satisfactory current performance . . . ." The March 19, 2003 notice made no mention of the COC Committee's concern with Missouri Engineering Corporation's lack of firing range experience. In light of the COC Committee report and the March 19, 2003 notice, it is reasonable to conclude that the SBA considered Missouri Engineering Corporation's lack of firing range experience to be of secondary importance to CSE's unfavorable past performance evaluation insofar as the SBA's competency determination was concerned. Accordingly, despite the SBA's expression of concern regarding Missouri Engineering Corporation's design experience, the court concludes that had the SBA adhered to the applicable statutes and regulations during its evaluation of CSE's past performance, CSE would have had a substantial chance of being issued a COC. Since CSE submitted the low bid, had the SBA conclusively determined that CSE was responsible, there would he been a "substantial chance [CSE] would have received the award." *Computer Sciences Corp. v. United States,* 51 Fed.Cl. at 306 (citing *Statistica, Inc. v. Christopher,* 102 F.3d at 1581). Therefore, CSE was prejudiced by the government's errors and omissions.

### C. *Plaintiff's claim that the SBA's decision to deny a COC lacked a rational basis*

■ The plaintiff also contends that the SBA's denial of a COC was without a rational basis. In this regard, agency action may be overturned on either or two grounds:

> Under the APA standards . . . a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or proce-

dure. When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations."

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (citations omitted). As discussed above, the plaintiff has demonstrated that the Corps and the SBA violated applicable statutes and regulations, and in a manner prejudicial to the plaintiff. Nothing more need be shown on the issue of whether or not there was a rational basis for the agency decision in order for this court to find for the plaintiff on this issue. In this case, the same violations of applicable statutes and regulations also demonstrated that the SBA's actions lacked a rational basis.

The United States Supreme Court has stated that, in order to determine whether or not agency action is arbitrary or capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 416, 91 S.Ct. 814; *see also Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856 (one ground which could constitute arbitrary or capricious agency action is whether an agency "entirely failed to consider an important aspect of the problem . . . .").

With respect to past performance, CSE submitted a list of roughly 105 projects and references for review, 35 of which were recent references. As discussed above, the SBA checked only three references from this extensive list, apparently ignoring the fact that the Corps had checked more than three references and, as a result, considered CSE's past performance to be "very good." As to its limited list of three references, the SBA did not consider whether negative comments of CSE's past performance stemmed from circumstances beyond CSE's control, or even whether CSE had taken appropriate corrective action in those three instances the SBA relied on to conclude that CSE was nonresponsible. The small sample of references, contrary findings by the Corps from a larger

sample, unexplored extenuating circumstances, and unexplored corrective action are "relevant factors" which the SBA should have considered, and "important aspect[s]" of the nonresponsibility determination which the SBA ignored. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 416, 91 S.Ct. 814; *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856. The SBA's actions were not reasonable under the circumstances, and reflect errors in judgment. If the SBA were to conduct itself similarly in all of its responsibility determinations, as a general proposition, small businesses would have difficulty qualifying for contract awards. The court concludes that the agency action taken was not reasonable under the applicable statutes, regulations and Supreme Court guidelines for arbitrary and capricious determinations.

### III. The Plaintiff's Prayer for Permanent Injunctive Relief

 The plaintiff requests permanent injunctive relief based on the above alleged government errors in the evaluation of the proposals. Courts should interfere with the government procurement process "only in extremely limited circumstances." *Banknote Corp. of America, Inc. v. United States,* 56 Fed.Cl. 377, 380 (2003) (quoting *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d at 1372)); *see also ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 64 (2001) (emphasizing that injunctive relief is not routinely granted) (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). Because injunctive relief is extraordinary in nature, a plaintiff must demonstrate the right to such relief by clear and convincing evidence. *Bannum, Inc. v. United States,* 56 Fed.Cl. 453, 457 (2003) (quoting *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991)); *Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 566 (2000); *Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239, 251 (1997), *aff'd,* 155 F.3d 566 (Fed.Cir.1998) (table); *Compliance Corp. v. United States,* 22 Cl.Ct. 193, 206 & n. 10 (1990), *aff'd,* 960 F.2d 157 (1992) (table); *but see Magnavox Elec. Sys. Co. v. United States,* 26 Cl.Ct. 1373, 1378 & n. 6 (1992). The decision on whether or not to grant an injunction is within the sound discretion of the trial court. *See FMC Corp. v. United States,* 3 F.3d at 427; *Asociacion Colombiana de Exportadores de Flores v. United States,* 916 F.2d 1571, 1578 (Fed.Cir.1990). Once injunctive relief is denied, "the movant faces a heavy burden of showing that the trial court abused its discretion, committed an error of law, or seriously misjudged the evidence." *FMC Corp. v. United States,* 3 F.3d at 427.

To obtain a temporary restraining order or preliminary injunction, the plaintiff must carry the burden of establishing entitlement to extraordinary relief based on the following factors:

> (1) the likelihood of plaintiff's success on the merits of its complaint; (2) whether plaintiff will suffer irreparable harm if the procurement is not enjoined; (3) whether the balance of hardships tips in the plaintiff's favor, and (4) whether a preliminary injunction will be contrary to the public interest.

*ES–KO, Inc. v. United States,* 44 Fed.Cl. 429, 432 (1999) (citing *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523–24 (2003); *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001) (" 'When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction.' ") (quoting *W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 647 (1997)); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 614, 616 (2001). The United States Court of Appeals for the Federal Circuit, in *FMC Corporation v. United States,* noted that:

> No one factor, taken individually, is necessarily dispositive. If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient,

given the weight or lack of it assigned the other factors, to justify the denial.

*FMC Corp. v. United States,* 3 F.3d at 427 (citations omitted).

The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires success on the merits. The court in *Bean Stuyvesant, L.L.C. v. United States* set out the test:

> (1) [A]ctual success on the merits; (2) that [plaintiff] will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) that granting the injunction serves the public interest.

*Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 320–21 (2000) (citing *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000), *aff'd,* 10 Fed.Appx. 957 (Fed.Cir. 2001)); *see also ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 505 n. 10 (1997) (" 'The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.' ") (quoting *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

The court is not persuaded that the extraordinary remedy of permanent injunctive relief is warranted in this case. A review of the four factors listed above follows. The plaintiff has succeeded on the merits of its case. The first factor, thus, weighs in the plaintiff's favor.

Regarding the second factor, the plaintiff claims that it will suffer irreparable harm if the court does not issue the injunctive relief requested: "[T]he separate actions of the SBA and COE have effectively deprived CSE of the opportunity to compete on a level playing field for the Fort Leonard Wood Contract. As a small business, the loss of the Fort Leonard Wood Contract substantially impacts CSE's annual income." Generally, "[l]ost profits and a lost opportunity to compete constitute irreparable injury." *Labat–Anderson Inc., v. United States,* 50 Fed. Cl. at 110. *See also United Payors & United Providers Health Servs., Inc., v. United States,* 55 Fed.Cl. 323, 333 (2003) ("[L]ost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.") (citing *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 323 (1998)).

In the present case, however, it is not at all clear that the plaintiff actually suffered lost profits. To the contrary, price realism analysis prepared by the Corps pursuant to the recommendation of the GAO indicates that CSE may have underbid its initial proposal by $1,196,353.00. Although the SBA found that CSE had sufficient financial resources to complete the Fort Leonard Wood firing range project "at a loss," even if it turned out that CSE had underbid the job by over one million dollars, the SBA concluded that "such a scenario would mean financial ruin for the applicant." Given the results of the price realism analysis, the court concludes that the plaintiff has failed to prove lost profits by clear and convincing evidence.

The third and fourth factors, however, tip the scales decisively against injunctive relief for the plaintiff. The Tucker Act directs this court to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action" when deciding bid protests. 28 U.S.C. § 1491(b)(3). A solicitation that addresses military preparedness implicates interests of national defense, which, thus, becomes–a factor the court must consider in the balance of harms. *See Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 323 (2002) (due to the impact on national security, injunctive relief was denied even if plaintiff could have succeeded on the merits); *Aero Corp., S.A. v. United States,* 38 Fed.Cl. 237, 241–242 (1997) ("The fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance ... of ... harms factor on Defendant's side of the scale.") (citing *Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 266, 269 (1997)); *see also Rockwell Int'l Corp. v. United States,* 4 Cl.Ct. 1, 6 (1983)

(indicating that requests for injunctive relief should give weight to national defense and national security concerns). In its initial request for funding from Congress, the United States Army indicated that the firing range renovations were "Fort Leonard Wood's most critical training facility requirement." The Army also reported that the existing firing range facilities were insufficient to train soldiers according to modern standards. Given the urgency of the Fort Leonard Wood firing range renovations, and in light of this court's congressional charge to "give due regard to the interests of national defense," the court concludes that the relative harm to the government and to the public interest caused by the delay that would result if injunctive relief were to issue substantially outweighs harm to the plaintiff. Accordingly, a permanent injunction will not issue in this case.

## IV. Bid Preparation Costs

Although the plaintiff's primary prayer is for permanent injunctive relief, the plaintiff also requests "[a]n order awarding CSE its costs for pursuing this action . . . ." and "[s]uch other relief as the Court may deem just and proper." Under the Tucker Act, the Court of Federal Claims, when deciding a post-award bid protest, is empowered to "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(3). The United States Court of Appeals for the Federal Circuit has held that "a losing competitor may recover the costs of preparing its unsuccessful proposal if it can establish that the Government's consideration of the proposals submitted was arbitrary or capricious." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (1996) (quoting *Lincoln Servs., Ltd. v. United States*, 230 Ct.Cl. 416, 678 F.2d 157, 158 (1982)). Because the Corps and the SBA violated applicable statutes and regulations with respect to the plaintiff's COC application, to the prejudice of the plaintiff, and because the decision to deny plaintiff a COC lacked a rational basis, the plaintiff is entitled to recover its bid preparation costs. The plaintiff also is entitled to costs pursuant to 28 U.S.C. § 2412(a) (2000).

## CONCLUSION

For the foregoing reasons, the court finds that the defendant acted improperly during the procurement at issue and plaintiff's bid protest is **SUSTAINED**. Although the plaintiff's request for injunctive relief is **DENIED**, plaintiff is awarded bid preparation costs. Plaintiff also is awarded costs pursuant to 28 U.S.C. § 2412(a) (2000). *See* RCFC 54(d)(1). Unless the parties can otherwise agree on plaintiff's bid preparation costs and costs pursuant to 28 U.S.C. § 2412(a) by filing a joint stipulation, plaintiff shall file a statement of its costs on or before **Thursday, September 25, 2003**. Any objections by the defendant to the plaintiff's statement of bid preparation costs and costs pursuant to 28 U.S.C. § 2412(a) shall be filed on or before **Thursday, October 23, 2003**, and any reply by the plaintiff shall be filed on or before **Thursday, October 30, 2003**. A joint stipulation proposing an amount to resolve the case may be filed at any time prior to **October 30, 2003**.

Prior to release of this opinion to the public, the parties shall review this unredacted opinion for competition sensitive, proprietary, confidential or otherwise protected information. In accordance with paragraph 9 of the court's April 30, 2003 protective order, the parties shall file a joint status report on **Thursday, September 25, 2003**. In the status report, the parties shall propose, with explanations, what previously sealed materials in the record or in this opinion continue to require protection, for what reasons and for what period of time. As part of the **Thursday, September 25, 2003 submission,** the parties shall file a proposed redacted version of this opinion.

**IT IS SO ORDERED.**